# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

TALETHA CRAYTON,                        )
individually and on behalf     )
of others similarly situated,  )
                               )
        Plaintiff,             )
                               )
        v.                     )          2:22-CV-4
                               )
SAILORMEN, INC.,               )
                               )
        Defendant.             )

## ORDER

This action is before the Court on Defendant's motion for summary judgment. Dkt. No. 29. For the reasons given below, the motion is **DENIED in part and GRANTED in part.** To the extent Plaintiff seeks summary judgment, see dkt. no. 32 at 11, that motion is **DENIED.**

## BACKGROUND

This case arises out of a dispute about overtime pay. Defendant Sailormen, Inc. ("Sailormen" or "Defendant") operates multiple Popeyes Louisiana Kitchen ("Popeyes") franchises. Dkt. No. 29-1 ¶ 1; Dkt. No. 32-2 ¶ 1. Plaintiff Taletha Crayton worked for Defendant's Popeyes franchises for over a decade, beginning as a Crew Member and working her way up to Area Manager. Dkt. No. 29-1 ¶¶ 7, 9–11; Dkt. No. 32-2 ¶¶ 7, 9–11.

Area Managers (or "above restaurant leaders") are "responsible for the overall sales, operations, profitability, and people management for the Popeyes restaurants in the Brunswick/Jesup, GA area." Dkt. No. 27-8 at 1; Dkt. No. 29-1 ¶ 4; Dkt. No. 32-2 ¶ 4. Their duties include: ensuring the restaurants are "staffed with qualified shift supervisors, and crew," "[d]evelop[ing] and execut[ing] plans to achieve top line sales performance compared to budget sales for each area," "[d]evelop[ing] plans to control expenses and achieve budget for restaurant operating profit," "[h]ir[ing], terminat[ing], and conduct[ing] performance reviews of restaurant general managers and ensur[ing] reviews for assistant managers, shift supervisors, and crew are completed." Dkt. No. 27-8 at 1–2; Dkt. No. 27 at 51:13–56:3 (Plaintiff acknowledging these items as Area Manager duties but stating that many of these duties could not be completed during the COVID-19 pandemic); Dkt. No. 28 at 13:4–16 ("An above restaurant leader's job is to make decisions. An above restaurant leader is not required to go and roll up their sleeves and work in a store. Their job is to figure out whether they're pulling employees from other stores, how they're going to operate and make the numbers. That's their job. Their job is not—not necessarily to go and cook chicken or pack orders or pack salads. Their job is to figure out how they're going to keep their store open at whatever

capacity, notify their seniors, you know, any change in operations.").

From October 15, 2018, to June 7, 2020, Plaintiff earned $1,050 per week. Dkt. No. 27 at 90:14-23; Dkt. No. 27-16 at 5-10. From June 8, 2020, until Plaintiff's termination, she earned $1,100 a week. Dkt. No. 27 at 89:10-90:10; Dkt. No. 27-16 at 1-5. Plaintiff also received bonuses. See, e.g., Dkt. No. 27 at 90:24-91:6 (discussing a $150 bonus Plaintiff received).

Overall, Plaintiff was responsible for "managing the day-to-day running" of approximately five Popeyes restaurants. Dkt. No. 28 at 5:8-14. The general managers of the stores Plaintiff managed reported to her, and Plaintiff reported to Regional Manager Willie Barnes. Id. at 5:14-22. Plaintiff was the highest-level manager at any restaurant where she worked unless Regional Manager Barnes was present. Dkt. No. 29-1 ¶ 31; Dkt. No. 32-2 ¶ 31.

While working as Area Manager, Plaintiff interviewed "hundreds" of job applicants for upper-management positions, hired "hundreds" of people, fired "hundreds" of people, and trained "hundreds if not thousands" of people. Dkt. No. 27 at 57:9-58:5, 60:11-14. She also sent daily and weekly reports to Regional Manager Barnes, detailing the stores' sales and cost numbers. Id. at 58:6-21. Crew Members did not have any role in creating these reports. Id. at 58:22-24.

Plaintiff also performed some of the same duties as Crew Members. See, e.g., Dkt. No. 27 at 121:16–122:16 ("[E]ven if I was the manager on duty[,] I still did another role. 'Cause if I was the manager on duty and didn't have a cook, then I do my manager work, jump to the back station, and be the batter person."). Before the COVID-19 pandemic, about twenty-percent of Plaintiff's job duties consisted of duties also performed by Crew Members. Dkt. No. 29-1 ¶ 37; Dkt. No. 32-2 ¶ 37. During the COVID-19 pandemic, as the restaurants became increasingly short-staffed, these duties grew to seventy-five percent of Plaintiff's total job duties. Dkt. No. 29-1 ¶ 37; Dkt. No. 32-2 ¶ 37; Dkt. No. 32-1 ¶ 7; Dkt. No. 27 at 62:25–63:5, 106:17:107:1, 107:18–21, 111:4–9, 114:13–16 (discussing how Plaintiff's stores were repeatedly "shorthanded").

As a result of these modified duties, Plaintiff estimates that, between March 2020 and November 2021, approximately twenty-percent of her working time "was devoted to management or administrative duties," and the "vast majority of [her] time was spent doing the same type of work done by the hourly employees." Dkt. No. 32-1 ¶ 3. Plaintiff states that many of her management duties "required little time," "very little time," or were responsibilities "shared by all employees." Id. ¶ 4.

Plaintiff contends that she worked "anywhere between 60 to 65 hours a week" during this time. Dkt. No. 27 at 115:20–24. According to Plaintiff, she complained to Regional Manager Barnes between

4

ten to twenty times about lack of overtime pay, the number hours she was working, and her underpayment generally. Id. 105:16–108:8, 109:4:21. She also "made a comment to HR" "[t]hat we have people making more money than me and I'm training in those individuals." Id. at 108:7–109:3.

On November 8, 2021, Regional Manager Barnes presented a probationary plan to Plaintiff, detailing "items and or tasks [that] are to be improved." Dkt. No. 27-9 at 1; Dkt. No. 27 at 60:19–61:17. The plan included items such as "[c]orrective action and or resolution of employee concerns in [a] timely manner," "improvement of staffing," "improvement of shift management and operations," "improvement on motivating staff and improving morale," and "consistent improvement and maintaining sales over last year." Dkt. No. 27-9 at 1; Dkt. No. 27 at 61:2–62:8. Plaintiff testified that Regional Manager Barnes wanted her to improve in these areas because many of these tasks could not be completed or she had difficulty completing them during the COVID-19 pandemic. Dkt. No. 27 at 62:1–12.

Defendant terminated Plaintiff's employment in November 2021. Dkt. No. 32 at 2; Dkt. No. 29-1 ¶ 38. She did not receive vacation pay or sick pay when she was terminated. Dkt. No. 27 at 130:7–10; cf. Dkt. No. 10 ¶ 18. Plaintiff acknowledges that it is Defendant's company policy not to pay employees for accrued vacation time or sick leave after their employment has ended. Dkt. No. 27 at 102:8–

5

104:16. Additionally, Plaintiff did not receive paid sick leave when she was an employee. Id. at 104:21-23. Furthermore, no one otherwise promised Plaintiff that Defendant would pay her for vacation or sick pay. Id. at 130:20-22.

Subsequently, Plaintiff filed suit, alleging claims under the Fair Labor Standards Act of 1938 ("FLSA") and Georgia law. See generally Dkt. No. 10. Specifically, Plaintiff alleges Defendant violated the FLSA by not paying her for overtime work (Count I). Dkt. No. 10 ¶¶ 1-16. Plaintiff also alleges that Defendant breached their contract by failing to pay Plaintiff for all the hours she worked, for her sick leave and vacation, and for other unspecified "benefits of employment" (Count II). Id. ¶¶ 17-19. Defendant filed a motion for summary judgment on all Plaintiff's claims. Dkt. No. 29. In her response brief, Plaintiff appears to also request summary judgment as to her exempt status for FLSA overtime pay. Dkt. No. 32 at 11 ("[T]he Court should reject . . . Defendant's claims that the Plaintiff was an 'exempt' employee as a matter of law.").

## LEGAL STANDARD

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" where the evidence would allow "a reasonable jury to return a verdict for the nonmoving party."

FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A fact is "material" only if it "might affect the outcome of the suit under the governing law." Id. (quoting Anderson, 477 U.S. at 248). The Court must view all facts in the light most favorable to the non-moving party and draw all inferences in its favor. Tolan v. Cotton, 572 U.S. 650, 657 (2014).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the Court that there is an absence of evidence to support the nonmoving party's case. See id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. See Anderson, 477 U.S. at 257. The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict

7

motion at trial based on the alleged evidentiary deficiency." <u>Id.</u> at 1117.

**DISCUSSION**

**I.   Defendant's motion for summary judgment is DENIED as to Plaintiff's FLSA claim.**

Section 207(a)(1) of the FLSA requires that employers pay employees "at a rate not less than one and one-half times the regular rate at which [they are] employed" for any hours the employee works in excess of forty hours per week. 29 U.S.C. § 207(a)(1). The FLSA, however, exempts employees employed "in a bona fide executive, administrative, or professional capacity" from this overtime pay requirement. 29 U.S.C. § 213(a)(1). Defendant argues that the executive and administrative exemptions apply to Plaintiff. Dkt. No. 29-2 at 2–12.

Additionally, 29 C.F.R. § 541.706(a) provides that "[a]n exempt employee will not lose the exemption by performing work of a normally nonexempt nature because of the existence of an emergency." Thus, (1) if the COVID-19 pandemic qualifies as an "emergency" under the regulation and (2) Plaintiff qualified as an exempt employee prior to the emergency, then (3) Plaintiff remained exempt even though her job duties changed during the pandemic. As a result, the Court will first examine whether the emergency exemption applies before addressing the parties' arguments about the executive and administrative exemptions.

**a. Issues of material fact exist as to the duration of the emergency exemption.**

Both parties accept and apply the usual nonemergency framework rather than the 29 C.F.R. § 541.706(a) emergency exemption. <u>See</u> Dkt. No. 29 at 2–12; Dkt. No. 32 at 4–11; Dkt. No. 34 at 4–13. However, Plaintiff's entire case rests on the proposition that her work duties changed *due to the COVID-19 pandemic.* Dkt. No. 32-1 ¶ 3. As mentioned, 29 C.F.R. Section 541.706(a) provides that "[a]n exempt employee will not lose the exemption by performing work of a normally nonexempt nature because of the existence of an emergency." "Thus, when emergencies arise that threaten the safety of employees, a cessation of operations or serious damage to the employer's property, any work performed in an effort to prevent such results is considered exempt work." <u>Id.</u>

However, "[a]n 'emergency' does not include occurrences that are not beyond control or for which the employer can reasonably provide in the normal course of business." <u>Id.</u> § 541.706(b). "Emergencies generally occur only rarely, and are events that the employer cannot reasonably anticipate." <u>Id.</u> The following are illustrative examples.

- "A mine superintendent who pitches in after an explosion and digs out workers who are trapped in the mine is still a bona fide executive." Id. § 541.706(c)(1).

- "Assisting nonexempt employees with their work during periods of heavy workload or to handle rush orders is not exempt work." Id. § 541.706(c)(2).

- "Replacing a nonexempt employee during the first day or partial day of an illness may be considered exempt emergency work depending on factors such as the size of the establishment and of the executive's department, the nature of the industry, the consequences that would flow from the failure to replace the ailing employee immediately, and the feasibility of filling the employee's place promptly." Id. § 541.706(c)(3).

Additionally, "[r]egular repair and cleaning of equipment is not emergency work, even when necessary to prevent fire or explosion; however, repairing equipment may be emergency work if the breakdown of or damage to the equipment was caused by accident or carelessness that the employer could not reasonably anticipate." Id. § 541.706(c)(4).

In July 2020, the Department of Labor ("DOL") issued the following guidance on its website regarding whether the COVID-19 pandemic qualifies as an "emergency" under the regulation:

[D]uring the period of a public health emergency declared by a Federal, State, or local authority with respect to COVID-19, otherwise-exempt employees may *temporarily* perform nonexempt duties that are required by the emergency without losing the exemption. [The Wage and Hour Division's] regulations permit an employee who otherwise qualifies for a Section 13(a)(1) exemption to perform nonexempt duties during emergencies that "threaten the safety of employees, a cessation of operations or serious damage to the employer's property" and which are beyond the employer's control and could not reasonably be anticipated*. COVID-19 is a rare event affecting the public welfare of the entire nation that an employer could not reasonably anticipate and is consistent with the FLSA's regulatory criteria for emergencies. Employees who are temporarily required to perform nonexempt duties due to COVID-19 may do so without losing the FLSA exemption, as long as they continue to be paid on a salary basis of least $684 per week.*

WaybackMachine Internet Archive, COVID-19 and the Fair Labor Standards Act Questions and Answers (emphasis added), https://web.archive.org/web/20200723003241/https:/www.dol.gov/ag encies/whd/flsa/pandemic [hereinafter DOL Guidance] (screen-capture from July 30, 2020); see also Westlaw Publisher's Editorial Staff, DOL issues "COVID-19 and the Fair Labor Standards Act—Questions and Answers," Employment Handbooks & Policies § 38:6 (Nov. 2022 Update). The DOL later removed this guidance from its website. See Dkt. No. 29-2 at 16 n.2.

In an oral hearing before the Court, the parties agree that Plaintiff qualified as an exempt employee prior to the COVID-19 pandemic. Dkt. No. 37. Thus, Plaintiff "performing work of a normally nonexempt nature" during the COVID-19 pandemic would not

cause Plaintiff to "lose the exemption" if the COVID-19 pandemic qualifies as an "emergency" under 29 C.F.R. Section 541.706(a).

The pandemic, at least at the start, qualified as an "emergency" under 29 C.F.R. Section 541.706(a). To begin, Plaintiff seeks recovery for overtime wages accrued when her duties and hours-worked changed during and as a result of the COVID-19 pandemic—specifically between March 2020 and November 2021. Dkt. No. 32-1 ¶ 3. The COVID-19 pandemic, as the DOL guidance indicates, fits within 29 C.F.R. Section 541.706's definition of an "emergency." DOL Guidance, supra. A global pandemic is a rare occurrence, and one that typical employers could not reasonably anticipate. Id. Plaintiff also acknowledges that she performed an increased amount of nonexempt work and worked overtime because otherwise the restaurants faced a "cessation of operations." 29 C.F.R. § 541.706(a); see also, e.g., Dkt. No. 27 at 121:16–122:16; Dkt. No. 32-1 ¶ 3.

Neither party presents caselaw or agency decisions determining whether the COVID-19 pandemic qualifies as an "emergency" under 29 C.F.R. Section 541.706. The relevant caselaw applying the regulation, while sparse, examines whether a situation is isolated or repeated to determine if a situation qualifies as an "emergency" under 29 C.F.R. Section 541.706. Where a plaintiff was required in an isolated, "exceptional" circumstance to perform nonexempt work, courts have found that the

plaintiff's nonexempt work may fit within the emergency exemption. See Castro v. WEA Elec. Contractors, Inc., No. 09-20973-CIV, 2010 WL 11506150, at *8 (S.D. Fla. Jan. 13, 2010) (holding that "a single instance in which [the plaintiff] did manual electrical work, which occurred when one of the workers electrocuted himself and [the] [p]laintiff had to step in to rescue him" was an "emergency"); Batze v. Safeway, Inc., 216 Cal. Rptr. 3d 390, 394 (Cal. Ct. App. 2017), as modified on denial of reh'g (May 3, 2017) (affirming that a strike period constituted an emergency); see also Rainey v. McWane, Inc., 552 F. Supp. 2d 626, 631 (E.D. Tex. 2008), aff'd, 314 F. App'x 693 (5th Cir. 2009) (finding no genuine issue as to whether Plaintiffs' primary duty was management after evaluating the factors and noting that "Plaintiffs stated that when they performed the non-management work it was often for training an employee and in cases of emergency" and "[t]he regulations specifically provide that an employee will not lose his exempt status for performing non-management work in the case of an emergency or while teaching by example" (citing 29 C.F.R. § 541.706)); Rainey v. McWane Inc., 314 F. App'x 693, 695 (5th Cir. 2009) (affirming the district court and noting that "[t]he depositions offered by the Plaintiffs suggest only that the production supervisors engaged in nonexempt production-line tasks when their units were understaffed").

However, where the plaintiff was repeatedly expected to perform nonexempt work, courts have found that the emergency exemption does not apply. See Hicks v. Mercedes-Benz U.S. Int'l, Inc., No. 7:08-CV-0536-LSC, 2012 WL 13024380, at *10 (N.D. Ala. July 3, 2012) (noting that filling in for a nonexempt employee would "usually be an emergency situation," but holding that "a once-a-week frequency does not suggest an actual 'emergency' as defined by the regulations"); Wirtz v. Patelos Door Corp., 280 F. Supp. 212, 218 (E.D.N.C. 1968) ("[A]n occasional substitution might fall within the realm of the emergency, but where it is done to the extent here testified to for the entire employment period, it could not be fairly said to be such."); Bullard v. Babcock & Wilcox Tech. Servs. Pantex, L.L.C., No. 2:07-CV-049-J, 2009 WL 1704251, at *25 (N.D. Tex. June 17, 2009), vacated on other grounds sub nom. Stokes v. BWXT Pantex, L.L.C., 424 F. App'x 324 (5th Cir. 2011) (holding that a building fire at a nuclear weapon assembly and disassembly plant was not an "emergency" because the employer could and did reasonably anticipate such fires and regularly conducted fire prevention activities).

Here, Plaintiff alleges that she was required to perform extra work due to the pandemic for about eight months, which could be considered a routinely performed act rather than "an occasional substitution," falling outside of the emergency exemption. Wirtz, 280 F. Supp. at 218.  However, pandemics do not routinely occur,

and the entire pandemic could be considered one exceptional, isolated occurrence. How courts have delt with extended employee strikes helps to resolve this issue.

Courts have held that "[a]n employee strike, even a lengthy one, can constitute an 'emergency'" under the regulation. Batze, 216 Cal. Rptr. 3d at 394 (citing Dunlop v. W. Union Tel. Co., No. 771-73, 1976 WL 1509, at *4 (D.N.J. Jan. 28, 1976)) (holding that a five-month strike could qualify as an emergency); cf. McReynolds v. Pocahontas Corp., 192 F.2d 301, 303 (4th Cir. 1951) ("Appellants' final contention is that [Appellee] lost his exempt status during strike periods by performing manual labor. This contention can be best answered in the language of the Kentucky Court in Mafizola v. Hardy-Burlingham Mining Co., 207 S.W.2d 769, 771 (Ky. 1948): 'Nor can we agree with plaintiff that the time he spent as a watchman during a strike was nonexempt work. While it is true that ordinarily a watchman's job is nonexempt work, yet when a strike is in progress and a foreman undertakes a watchman's duties, he is performing such services in an executive capacity. In such circumstances, it is only an executive employee who is not a member of the union on strike who can be depended upon to perform such duties. Indeed, it is not unusual for higher executives than a section foreman to perform manual work in the time of a strike, but such are performed in their capacity as executives and they are not acting as laborers.' For these reasons, the decision of

the District Court is affirmed."); Brennan v. W. Union Tel. Co., 561 F.2d 477, 484 (3d Cir. 1977) (explaining that "[t]he district court concluded that Western Union's executive employees who performed strike duty are subject to exemption" under the prior version of the emergency exemption but declining to "discuss the merits of this issue" because Western Union "disclaimed reliance" on the regulation). In Dunlop, the court directed the Secretary of Labor to "make an analysis of all the facts in order to determine how long the 'emergency' . . . continued." 1976 WL 1509, at *4; see also Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122-01, 22189 ("The Department also recognizes that, depending upon the circumstances, a labor strike may qualify as an emergency for some short time period, although all the facts must be considered in order to determine the length of the 'emergency' situation.").

A pandemic is like a worker strike in that it can be a situation "for which the employer [cannot] reasonably provide in the normal course of business" and may result in "a cessation of operations." 29 C.F.R. § 541.706(b). Furthermore, like a worker strike, a pandemic can last several months and thus the "emergency" may end even if the pandemic is ongoing. As a result, a pandemic, like a strike, can fall under the emergency exemption, and how long the exemption applies depends on the specific facts of each

case. See Defining and Delimiting the Exemptions, 69 Fed. Reg. at 22189 ("The Department agrees . . . that emergencies arising out of an employer's business and affecting the public health or welfare can qualify as emergencies under this section, applying the same standards as emergencies that affect the safety of employees or customers. The main purpose of this provision is to provide a measure of common sense and flexibility in the regulations to allow for real emergencies 'of the kind for which no provision can practicably be made by the employer in advance of their occurrence.'").

This is supported by DOL guidance, which is entitled to Skidmore deference "proportional to its power to persuade." Warshauer v. Solis, 577 F.3d 1330, 1335 (11th Cir. 2009) (quoting United States v. Mead Corp., 533 U.S. 218, 235 (2001)). The DOL Guidance stated that "employees may *temporarily* perform nonexempt duties that are required by the emergency," which indicates that exempt employees may not routinely or indefinitely perform these nonexempt duties without losing their exempt status. DOL Guidance, supra (emphasis added). According to Defendant, the DOL posted the guidance to its website for an unspecified amount of time during the COVID-19 pandemic. Dkt. No. 29 at 16 n.2 ("The DOL has continued to update its online guidance, and the above-quoted language no longer appears on the DOL's website. It is preserved, however, in the following secondary source, among others."); see

also Dkt. No. 32 at 12 (arguing that the guidance is "of no legal significance" but not disputing its authenticity); Dkt. No. 34 at 12 (arguing that the guidance is subject to Skidmore deference). Thus, while the guidance has "validity [in] its reasoning" and is "consisten[t] with earlier . . . pronouncements," the "thoroughness evident in its consideration" and the extent to which the agency itself intended for the guidance to apply is unclear. Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944). As a result, this guidance is far from controlling, but it offers some modicum of further support for the conclusion reached through analysis of the regulation and relevant caselaw.

In conclusion, because the COVID-19 pandemic was a rare occurrence that threatened the cessation of Defendant's operations (and the safety of its employees) and was beyond Defendant's control, it qualifies as an "emergency," at least at the start, under 29 C.F.R. Section 541.706. However, a genuine issue of material fact exists as to how long the "emergency" lasted.

Plaintiff testified that she was shorthanded and ran restaurants shorthanded routinely, and that she complained about the hours she worked and her underpayment to Regional Manager Barnes between ten and twenty times. Dkt. No. 27 at 105:16-108:8, 109:4:21. Despite this short-staffing, Plaintiff testified that she helped open new restaurants "[a]bout six, seven different times" during the pandemic. Dkt. No. 27 at 55:15-57:8. Plaintiff

also stated that approximately twenty percent of her time was dedicated to management or administrative duties between March 2020 to November 2021, while the "vast majority" of her time was spent doing nonexempt work. Dkt. No. 32-1 ¶ 3. Drawing inferences in Plaintiff's favor, Plaintiff's months of overtime and increased amount of nonexempt work could have shifted from an emergency response to a regular routine which Defendant could reasonably anticipate. Cf. Defining and Delimiting the Exemptions, 69 Fed. Reg. at 22189 ("[I]t continues to be the Department's position that nonexempt work *cannot routinely be assigned* to exempt employees solely for the convenience of an employer without calling into question the application of the exemption to that employee." (emphasis added)); 29 C.F.R. § 541.706(c)(2) ("Assisting nonexempt employees with their work during periods of heavy workload or to handle rush orders is not exempt work."). Drawing inferences in Plaintiff's favor, the "emergency" ended at some point prior to her termination. As a result, the Court next examines whether Plaintiff qualified for the executive or administrative exemption during the time-period when the emergency exemption presumptively did not apply.

**b. Issues of material fact exist as to whether the executive exemption applied to Plaintiff during the COVID-19 pandemic.**

An employee employed "in a bona fide executive, administrative, or professional capacity" is exempt from the FLSA's overtime requirement. 29 U.S.C. § 213(a)(1).

An "employee employed in a bona fide executive capacity" must:

1. Be "[c]ompensated on a salary basis . . . at a rate of not less than $684 per week";

2. Have as their "primary duty . . . management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof";

3. "[C]ustomarily and regularly direct[] the work of two or more other employees"; and

4. Have "the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."

29 C.F.R. § 541.100(a).

Plaintiff readily satisfies requirements (1), (3) and (4). As for the first requirement, Plaintiff received between $1,050 to $1,100 per week for the relevant timeframe, which falls well above the $684 requirement. Dkt. No. 27 at 90:14-23, 89:10-90:10; Dkt. No. 27-16 at 1-10. For the third requirement, Plaintiff "customarily and regularly direct[ed] the work of two or more other employees." 29 C.F.R. § 541.100(a)(3). She directed the work of assistant managers, shift supervisors, and crew members for

20

approximately five local Popeyes restaurants, where she also trained "hundreds" of employees. Dkt. No. 27 at 60:6-14; Dkt. No. 28 at 5:8-22; Dkt. No. 29-1 ¶ 31; Dkt. No. 32-2 ¶ 31. Finally, for the third requirement, Plaintiff had the authority to hire and fire employees, and during her tenure as Area Manager she hired and fired "hundreds" of employees. Dkt. No. 27 at 57:9-58:5.

The parties dispute the second requirement, whether Plaintiff had as her "primary duty . . . management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof." Dkt. No. 29-2 at 3; Dkt. No. 32 at 4. The DOL defines "management" to include, but not be limited to:

> activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. Plaintiff admits that she performed some management activities, but she contends that these activities were

not her "primary duty" because "the work [she] did was a small part of the day" and she "did not spend anywhere close to fifty-percent of her time doing supervisory work." Dkt. No. 32 at 9–10.

"'Primary duty' means the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). According to the DOL, "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." Id. The DOL delineates four factors "to consider when determining the primary duty of an employee." Id. These factors

> include, but are not limited to, [1] the relative importance of the exempt duties as compared with other types of duties; [2] the amount of time spent performing exempt work; [3] the employee's relative freedom from direct supervision; and [4] the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

Id. Importantly, while the DOL recognizes that "[t]he amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee," it also specifically cautions that "[t]ime alone . . . is not the sole test, and nothing . . . requires that exempt employees spend more than 50 percent of their time performing exempt work." Id. § 541.700(b). In other words, "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the

22

other factors support such a conclusion." Id. The DOL elaborates on this distinction:

> for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

Id. § 541.700(c).

In this case, the second and fourth factors—amount of time spent and the employee's salary compared to wages paid to other employees—weigh against finding that Plaintiff's "primary duty" was management, while the first and third factors—relevant importance of exempt duties and freedom from direct supervision—weigh in favor of such a finding.[1] Drawing inferences in Plaintiff's favor, a reasonable juror could find that her primary duty was not management, and, by extension, that she was an exempt

---

[1] Plaintiff analyzes only the second factor in her brief, dkt. no. 32 at 4–11, but the Court evaluates all factors, following applicable precedent, see, e.g., Mobley v. Shoe Show, Inc., No. 2:17-cv-024, 2018 WL 6357499, at *6 (S.D. Ga. Sept. 24, 2018); Knight v. Beall's Outlet Stores, Inc., No. 215-cv-166, 2017 WL 149810, at *3 (S.D. Ga. Jan. 13, 2017); Jackson v. Jean Coutu Grp. (PJC) USA, Inc., No. 206-cv-194, 2007 WL 1850710, at *3 (S.D. Ga. June 26, 2007).

executive employee. Thus, the Court **DENIES** Defendant's motion for summary judgment as to her FLSA claim on this basis.

1. **The relative importance of the exempt duties as compared with other types of duties indicates that Plaintiff's primary duty was management.**

The relevant evidence shows that Plaintiff's primary duty was management. All the duties Defendant lists in its Area Manager job summary are management duties. Dkt. No. 27-8 at 1-2. While this is not dispositive of whether Plaintiff's "primary duty" was management, it indicates that Defendant placed the most importance on Plaintiff's ability to perform her job duties.

This conclusion is supported by Defendant's 30(b)(6) deponent and Plaintiff herself. Defendant's 30(b)(6) deponent testified that "[a]n above restaurant leader's job is to make decisions . . . . Their job is to figure out whether they're pulling employees from other stores, how they're going to operate and make the numbers." Dkt. No. 28 at 13:4-10. The 30(b)(6) deponent further elaborated, "[t]heir job is not—not necessarily to go and cook chicken or pack orders or pack salads. Their job is to figure out how they're going to keep their store open at whatever capacity, notify their seniors, you know, any change in operations." Id. at 13:11-16. Thus, Defendant valued Plaintiff's work most for her managerial duties, not for the non-exempt work she performed.

Plaintiff also admits that she led and managed various teams and that "[e]ven if someone does a good job at cooking or cleaning or bagging, that doesn't necessarily mean that that person would be capable of being an area manager." Dkt. No. 27 at 59:5-60:2. This further supports that Defendant valued Plaintiff for her ability to perform managerial tasks. Moreover, Plaintiff admitted that all items Regional Manager Barnes listed on his probationary plan were "management duties," not crew-member duties. Id. at 61:2-25; see also Dkt. No. 27-9 at 1. Again, this shows that Defendant was most concerned with Plaintiff's performance of her managerial, not her non-exempt, duties. Thus, the evidence shows that Defendant valued Plaintiff's exempt duties more than her non-exempt duties. This factor weighs in favor of finding that Plaintiff's "primary duty" was management.

> **2. The amount of time spent performing exempt work indicates that Plaintiff's primary duty was not management.**

Plaintiff estimates that she spent about twenty percent of her time performing exempt work, and the "vast majority of [her] time was spent doing the same type of work done by the hourly employees." Dkt. No. 32-1 ¶ 3. As a result, this factor weighs against finding that her "primary duty" was management.

> **3. Plaintiff's relative freedom from direct supervision indicates that her primary duty was management.**

25

Plaintiff was subject to some direct supervision from Regional Manager Barnes. Dkt. No. 29-1 ¶ 12; Dkt. No. 32-2 ¶ 12. Plaintiff sent reports to Regional Manager Barnes daily, and Regional Manager Barnes sometimes directed Plaintiff's actions. See, e.g., Dkt. No. 27-10 at 1 (Plaintiff reporting to Regional Manager Barnes about a restaurant's progress and how she directed its employees); Dkt. No. 27-11 at 1 (Regional Manager Barnes directing Plaintiff to "review, resolve and close all complaints"); Dkt. No. 27-13 at 1-4 (Plaintiff updating Regional Manager Barnes on issues with a restaurant). Plaintiff also needed to consult Regional Manager Barnes to hire or fire management, spend over $200, and approve overtime. Dkt. No. 27 at 72:12-22, 112:23-25, 169:2-11.

Otherwise, Plaintiff acted as a supervisor, directing Assistant Managers, Shift Supervisors, and Crew Members. Dkt. No. 27-8 at 1-2; Dkt. No. 27 at 51:13-56:3; Dkt. No. 27-10 at 2 (Plaintiff evaluating a restaurant's performance and directing how its workers needed to improve). Plaintiff was responsible for "managing the day-to-day running" of approximately five restaurants, ensuring that "they were producing the required numbers, running the requisite food cost, running the requisite employee cost and other restaurant metrics . . . to the level that the brand accepted." Dkt. No. 28 at 5:11-22; Dkt. No. 27-13 at 1, 3-4 (Plaintiff directing subordinates on their performance

metrics). Plaintiff's job was "to figure out how . . . to keep
[the] store[s] open at whatever capacity, [and to] notify [her]
seniors [about] any change in operations." Dkt. No. 28 at 13:11–
16. As a result, her determination that she had to perform non-
exempt work to keep the restaurants open "would've been a
management decision taken on her own." Id. at 13:17–14:3. In other
words, she "could make the decisions that she needed to make to
run her stores." Id. at 14:4–7.

    In Thomas v. Jones Restaurants, Inc., 64 F. Supp. 2d 1205,
1214 (M.D. Ala. 1999), the court held that the plaintiff was
"relatively free from supervision" even though the plaintiff's
supervisor called her ten to fifteen times a day and initially
"visited the restaurant everyday." The court noted, "the fact that
[the supervisor] was hands-on does not alter the fact that [the
plaintiff] was ultimately responsible for the restaurant." Id.
Similarly, while Plaintiff communicated frequently with Regional
Manager Barnes, see, e.g., dkt. no. 27 at 58:6–21, 81:22–82:13,
105:19–106:13, 169:2–11, "the record indicates that [Plaintiff]
was relatively free from supervision" because she was "answerable
for the performance of the restaurant," Thomas, 64 F. Supp. 2d at
1214 (alteration accepted); Dkt. No. 28 at 13:4–16; Dkt. No. 29-1
¶ 4; Dkt. No. 32-2 ¶ 4.  Plaintiff's job was to ensure that the
restaurants were operational and meeting their metrics, and she
remained relatively free in her discretion to decide how to do so.

Cf. id. at 1212–13 ("Significantly, the court found that the assistant managers' discretionary power was not diminished even though they had to follow Burger King's 'remarkably detailed routine' in order to help ensure the organization's success." (citing Donovan v. Burger King Corp., 675 F.2d 516, 521–22 (2d Cir. 1982))).

Further supporting this conclusion is Moore v. Tractor Supply Co., 352 F. Supp. 2d 1268, 1277 (S.D. Fla. 2004), aff'd, 140 F. App'x 168 (11th Cir. 2005). In Moore, the court held that the plaintiff store manager, "though he was to follow company policy as dictated by written and oral instructions, was not micromanaged to the extent that he became a non-exempt employee." Id. at 1278. In that case, the district managers visited the plaintiff's store "approximately once a week for a 'walk thru,' and any other communication [the plaintiff] had with his district managers was via telephone or email." Id. at 1277-78. Here, Plaintiff—who managed multiple restaurants—had more responsibility than the Moore plaintiff who managed only a single store. Like the plaintiff and manager in Moore, Plaintiff and Regional Manager Barnes communicated frequently via email, and Regional Manager Barnes would sometimes go to stores where Plaintiff was working that day for meetings. See, e.g., Dkt. No. 27 at 68:15–71:18, 123:7-14. However, in Regional Manager Barnes's absence, Plaintiff was always the highest-level management person at the location at which

she worked on any particular day. Id. at 123:7-14. Thus, like the plaintiff in Moore, Plaintiff was subject to some direct supervision from Regional Manager Barnes, but she was relatively free from direct supervision. See also Jackson, 2007 WL 1850710, at *4 ("It is clear that Plaintiff was relatively free from direct supervision as her direct supervisor, the district manager, oversaw twenty-two (22) stores in his district, spoke with [the plaintiff] on the phone one to three times a week, and visited the store approximately once every three weeks for two to three hours."); Moore, 352 F. Supp. 2d at 1278 (collecting cases "where courts concluded that managers were sufficiently independent so as to be exempt"). This factor therefore weighs in favor of finding that Plaintiff's "primary duty" was management.

4. **The relationship between Plaintiff's salary and the wages paid to other employees indicates that Plaintiff's primary duty was not management.**

The Eleventh Circuit has compared salaries and hourly wages by determining the salaried plaintiff's equivalent hourly rate using the number of hours the plaintiff claims to have worked. Morgan v. Fam. Dollar Stores, Inc., 551 F.3d 1233, 1257 (11th Cir. 2008) (determining what the plaintiffs' hourly rate would be assuming a sixty-hour and a seventy-hour workweek, the number of hours the plaintiffs said they usually worked); see also Jones v. Virginia Oil Co., 69 F. App'x 633, 639 (4th Cir. 2003) (comparing

the plaintiff's weekly salary to the amount an hourly employee would make working sixty hours per week, the number of hours that the plaintiff typically worked); Donovan, 675 F.2d at 522 (holding that assistant managers "earning $250 or more were paid substantially higher wages [than employees earning minimum wage] even taking their longer hours into account"). But see Moore, 352 F. Supp. 2d at 1278–79 (comparing the plaintiff's weekly salary to the amount an hourly employee would make for working forty hours a week, even though the plaintiff claimed he worked overtime); Jackson, 2007 WL 1850710, at *4 ("[T]here is no evidence on the specific question as to how much subordinated employees earned. It appears likely, however, that Plaintiff's $670 weekly salary as store manager was significantly higher than that earned by hourly associates performing comparable non-managerial duties.").

During the COVID-19 pandemic, exempt Crew Members earned between $12 to $17 an hour. Dkt. No. 27 at 22:18–21. During that time, Plaintiff earned $1,100 per week. Dkt. No. 27 at 89:10–90:10; Dkt. No. 27-16 at 1–10. Plaintiff also maintains that she worked "anywhere between 60 to 65 hours a week." Dkt. No. 27 at 115:20–24. Thus, Plaintiff's hourly wage would amount to $18.33 for a sixty-hour work week and $16.92 for a sixty-five-hour work week. Comparing the lowest amount Plaintiff earned and the highest amount a Crew Member could earn, the two amounts are roughly equal, with Plaintiff earning $0.08 less. However, Plaintiff also

received bonuses. See, e.g., Dkt. No. 27 at 90:24-91:6 (discussing a $150 bonus Plaintiff received). This fact by itself weighs slightly in favor of finding that Plaintiff is nonexempt. Moore, 352 F. Supp. at 1278-79 (noting that whether a plaintiff is eligible to receive a bonus is a relevant factor to consider when examining the relationship between salary and wages).

Plaintiff received $12,120.85 in bonuses between November 5, 2018 and December 29, 2021 (1,150 days). Dkt. No. 27-16 at 1-10. This averages about $73.77 per week. So, Plaintiff really earned about $1,173.77 per week. Incorporating what Plaintiff earned through bonuses, Plaintiff earned the equivalent of $19.56 per hour for a sixty-hour workweek and $18.05 per hour for a sixty-five-hour workweek. Comparing the lowest amount Plaintiff earned and the highest amount a Crew Member could earn, Plaintiff earned about $1 more per hour, which amounts to about $65 more per week. The Eleventh Circuit has found that where a store manager earned less than a dollar more per hour than assistant managers, the two earned "roughly the same." Morgan, 551 F.3d at 1257-58; but see Jones, 69 F. App'x at 639 (finding that "[t]he undisputed evidence [which] show[ed] that [the plaintiff] was making more, or at least the same, in her management positions as nonexempt employees" indicated that the plaintiff was an exempt employee); Jackson v. Advance Auto parts, Inc., 362 F. Supp. 2d 1323, 1336 (N.D. Ga. 2005) ("Plaintiffs' argument that they were improperly classified

31

as exempt because their compensation was comparable to that of Advance's nonexempt employees is also without merit. As salaried employees, Plaintiffs received the same pay even if they worked less than 40 hours, and they were eligible for bonuses for which hourly employees were not."). Thus, drawing inferences in Plaintiff's favor, Plaintiff and the nonexempt employees earned "roughly the same," which weighs in favor of finding that Plaintiff is nonexempt. Cf. Moore, 352 F. Supp. 2d at 1278 ("[C]ourts have found a sufficient ratio where the manager made at least $250 more per month than the assistant manager and was the only worker eligible for a bonus, where the department manager's salary was 42 percent higher than the weekly salary of the highest paid associate and the manager alone received a bonus and where the manager made twice as much as the hourly employees.").

### 5. The factors taken together create disputes of material fact as to whether the executive exemption applies.

Defendant argues the factors show that Plaintiff was an exempt executive, citing numerous cases where the plaintiffs spent less time doing exempt work than Plaintiff and the courts still found that the plaintiffs qualified for the executive exemption. Dkt. No. 29-2 at 6 (first citing Calvo v. B&R Supermarket, Inc., 63 F. Supp. 3d 1369, 1383 (S.D. Fla. 2014); then citing Moore, 352 F. Supp. 2d at 1272-79; and then citing Jackson, 362 F. Supp. 2d at 1334). In these cases, however, all other factors besides time

allocation indicated that the plaintiffs were exempt employees. See Calvo, 63 F. Supp. 3d at 1381 (S.D. Fla. 2014) (holding that the plaintiff was exempt where all factors except time allocation indicated that the plaintiff qualified for the executive exemption); Jackson, 362 F. Supp. 2d at 1334 (same); Moore, 352 F. Supp. 2d at 1271-79 (same); cf. Byers v. Petro Servs., Inc., 110 F. Supp. 3d 1277, 1284-85 (S.D. Fla. 2015) (finding that the plaintiff was an exempt employee where all factors except time allocation indicated that the plaintiff was exempt, but not considering the plaintiff's salary). Drawing inferences in Plaintiff's favor, because both time allocation and the relationship between Plaintiff's salary and nonexempt worker's wages indicate that Plaintiff is a nonexempt employee, a genuine dispute of material fact exists as to whether Plaintiff was an exempt executive employee. Defendant's motion for summary judgment is therefore **DENIED** as to this issue.

**c. Issues of material fact exist as to whether the administrative exemption applied to Plaintiff during the COVID-19 pandemic.**

As mentioned, the FLSA exempts employees "in a bona fide executive, administrative, or professional capacity" from the overtime pay requirement. 29 U.S.C. § 213(a)(1). "'Employee employed in a bona fide administrative capacity" means any employee:

> 1) Compensated on a salary or fee basis . . . at a rate of not less than $684 per week . . . ;
>
> 2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> 3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a)(1). In this case, Plaintiff was compensated on a salary basis at a rate greater than $684 per week. Dkt. No. 27 at 89:10-90:10, 90:14-23; Dkt. No. 27-16 at 9-10. Thus, Plaintiff satisfies the first factor.

"The phrase 'directly related to the management or general business operations' refers to the type of work performed by the employee." 29 C.F.R. § 541.201(a). "To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." Id. This includes, but is not limited to,

> work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

Id. § 541.201(b). An employee may qualify for both the administrative exemption and another exemption. Id. Additionally, the same definition of "primary duty" applies to the administrative exemption as to the executive exemption. 29 C.F.R. § 541.700(a).

Here, Plaintiff's duties included "budgeting," "quality control," and "personnel management." Dkt. No. 27-8 at 1-2; Dkt. No. 27 at 45:6-16; 46:7-22, 57:9-58:21, 60:11-14; see also Dkt. No. 29 at 10. However, for the same reasons discussed supra pp. 21-34, whether these activities constituted Plaintiff's "primary duty" should be left to the jury. Thus, Defendant's motion for summary judgment as to this issue is **DENIED**.

## II. Defendant's motion for summary judgment is DENIED as to willfulness under the FLSA.

The statute of limitations for an FLSA claim is typically two years. 29 U.S.C. § 255(a). However, if the defendant willfully violated the statute, the plaintiff has three years to bring a claim. Id. "The burden rests with the employee to 'prove by a preponderance of the evidence' that her employer acted willfully." Davila v. Menendez, 717 F.3d 1179, 1185 (11th Cir. 2013). Drawing inferences in favor of Plaintiff, this claim survives Defendant's motion for summary judgment.

An employer willfully violates the FLSA if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." McLaughlin v. Richland

Shoe Co., 486 U.S. 128, 130-35 (1988).  "An employer knowingly violates the Act if he disregards the minimum wage laws deliberately or intentionally, such as by ignoring 'advice from a responsible official that the conduct in question is not lawful.'" Davila, 717 F.3d at 1185 (alterations accepted) (citations omitted). "An employer acts with reckless disregard for the Act if the employer's conduct is more than 'merely negligent,' and is blameworthy 'if the employer should have inquired further into whether his conduct was in compliance with the Act and failed to make adequate further inquiry.'" Id. (alterations accepted) (citations omitted).

Plaintiff testified that she complained to Regional Manager Barnes between ten to twenty times about lack of overtime pay, the number hours she was working, and her underpayment generally. Dkt. No. 27 at 105:16-108:8, 109:4.21. She also "made a comment to HR" "[t]hat we have people making more money than me and I'm training in those individuals." Id. at 108:7-109:3. Taking inferences in Plaintiff's favor, this could amount to reckless disregard because Plaintiff repeatedly made Regional Manager Barnes aware of the hours Plaintiff was working and her lack of overtime payment. As a result, a reasonable juror could conclude that Regional Manager Barnes "should have inquired further into whether his conduct was in compliance with the Act and failed to make adequate further inquiry." Davila, 717 F.3d at 1185 (alterations accepted)

(citation omitted). Thus, Defendant's motion for summary judgment is **DENIED** as to willfulness under the FLSA.

### III. Defendant's motion for summary judgment is DENIED as to the FLSA good faith defense.

Usually, a Plaintiff is entitled to her unpaid overtime damages and liquidated damages for an FLSA violation. 29 U.S.C. § 216. However, "[i]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA], as amended, the court may, in its sound discretion, award no liquidated damages." 29 U.S.C. § 260. "To satisfy the good faith requirement, an employer must show that it acted with both objective and subjective good faith." Rodriguez v. Farm Stores Grocery, Inc., 518 F.3d 1259, 1272 (11th Cir. 2008).

Here, the July 2020 DOL guidance stated that "otherwise-exempt employees [could] temporarily perform nonexempt duties that are required by the [COVID-19] emergency without losing the exemption." DOL Guidance, supra. This guidance could provide objective evidence of good faith. But Defendant has offered no evidence indicating that it relied upon the DOL guidance or that it took steps to ensure FLSA compliance. Dkt. No. 32 at 12; cf. Dkt. No. 28 at 18:2–16 (Defendant's 30(b)(6) deponent stating that

he had not received advice on the FLSA exemptions from a law firm or the DOL and he did not know whether any of his supervisors had).

Moreover, as mentioned, Plaintiff repeatedly complained to Regional Manager Barnes about the hours she was working compared to the pay she received. Dkt. No. 27 at 105:16–108:8, 109:4:21. She also "made a comment" about this issue to HR. Id. at 108:7–109:3. Drawing inferences in Plaintiff's favor, it is possible that Defendant did not act with good faith because Plaintiff alerted Defendant to a possible FLSA violation and it did not investigate further. Thus, the Court **DENIES** Defendant's motion for summary judgment on this issue.

## IV. Defendant's motion for summary judgment is GRANTED as to Plaintiff's contract claim.

In her complaint, Plaintiff alleges that "Defendant promised [her] vacation pay and sick pay, but [it] has failed to pay the Defendant [sic] her accumulated vacation and sick pay." Dkt. No. 10 ¶ 18. Plaintiff also alleges that "the failure of Defendant to pay . . . Plaintiff for all of her hours worked constitutes a breach of contract, and . . . Plaintiff is entitled to recover for unpaid wages she was entitled to receive, as well as for all accumulated sick leave, vacation pay, and other benefits of employment." Id. ¶ 19. Defendant argues that it is entitled to summary judgment on this claim because (1) Plaintiff cannot prove that any contract entitled her to vacation or sick pay, and (2) to

38

the extent Plaintiff seeks to recover the same allegedly unpaid overtime as in her FLSA claim, that claim is barred. Dkt. No. 29-2 at 17. In its reply brief, Defendant further asserts that Plaintiff has abandoned her breach of contract claim by failing to address it in her response brief. Dkt. No. 34 at 1–3. All these arguments succeed.

First, Plaintiff does not identify what promises form the basis of the alleged contract. Plaintiff admits that no one promised her payment of any accumulated vacation or sick pay upon her termination—Plaintiff did not even receive sick pay during her employment. Dkt. No. 27 at 104:21–23. Further, Sailormen's employee handbook states: "[u]nused vacations will not be paid upon termination of employment unless required by the law of the state in which the employee works." Dkt. No. 27-17 at 11. Without a valid contract, Plaintiff cannot succeed in her breach of contract claim. See, e.g., TDS Healthcare Sys. Corp. v. Humana Hosp. Ill., Inc., 880 F. Supp. 1572, 1583 (N.D. Ga. 1995) ("The essential elements of a breach of contract claim are (1) a valid contract; (2) material breach of its terms; and (3) damages arising therefrom.").

Moreover, as Defendant points out, Plaintiff admits that her breach-of-contract claim is based on unpaid vacation and sick pay only, dkt. no. 27 at 130:4–13, but if Plaintiff still seeks to recover unpaid overtime, this is barred by the FLSA's exclusive

remedy, dkt. no. 29-2 at 17 (quoting <u>Bule v. Garda CL Se., Inc.</u>, No. 14-21898-CIV, 2014 WL 3501546, at \*2 (S.D. Fla. July 14, 2014) ("Section 216 of the FLSA is the exclusive remedy for enforcing rights created under the Act.")).

Lastly, Plaintiff seems to recognize her claim's deficiencies because she fails to address the contract claim in her response brief. <u>See generally</u> Dkt. No. 32. As a result, Defendant argues that Plaintiff has abandoned this claim. Dkt. No. 34 at 1-3. This argument also has merit. <u>See, e.g.</u>, <u>Daughtry v. Manning</u>, No. CV 2:20-005, 2021 WL 1202071, at \*2 n.5 (S.D. Ga. Mar. 30, 2021) ("To the extent Plaintiffs assert a claim for violation of their 'rights to feel secure in their home,' the Court deems those claims abandoned. In their response to Defendants' motion to dismiss, Plaintiffs did not respond to Defendants' argument that such a claim, if asserted, was subject to a two-year statute of limitations applicable to personal injury actions. . . . Their response brief in opposition to the motion to dismiss seeks to defend only their malicious prosecution and truck-taking claims. As a result, the Court focuses on those non-abandoned claims."). For all the aforementioned reasons, the Court **GRANTS** Defendant's motion for summary judgment as to Plaintiff's breach-of-contract claim.

**V.   To the extent Plaintiff seeks summary judgment as to her exempt status, Plaintiff's motion is DENIED.**

In her response brief, Plaintiff urges the court to "reject . . . Defendant's claims that Plaintiff was 'exempt' as a matter of law." Dkt. No. 32 at 11. To the extent Plaintiff seeks summary judgment on this issue, it is **DENIED** for the reasons discussed supra pp. 20–34. Drawing inferences in favor of Defendant, at least at the beginning of the pandemic, Plaintiff was exempt under the emergency exemption, 29 C.F.R. § 541.706(a). How long the emergency exemption lasted and whether the executive or administrative exemptions applied to Plaintiff involve issues of material fact that render summary judgment on this issue improvident.

## CONCLUSION

Genuine issues of material fact exist as to how long the emergency exemption in 29 C.F.R. § 541.706(a) applied and whether Plaintiff was an exempt executive or administrative employee during the time-period when the emergency exemption did not apply. Thus, Defendant's motion for summary judgment, dkt. no. 29, is **DENIED** as to Plaintiff's FLSA claim. Moreover, a reasonable juror could conclude that Defendant acted willfully or without good faith as to Plaintiff's lack of overtime pay. Defendant's motion for summary judgment, dkt. no. 29, is therefore **DENIED** as to willfulness under the FLSA and the FLSA good-faith defense. Plaintiff presents no evidence that could support her contract claim and she failed to defend her contract claim in her response brief. As a result, Defendant's motion for summary judgment, dkt.

no. 29, is **GRANTED** as to Plaintiff's contract claim. To the extent Plaintiff seeks summary judgment as to her FLSA-exempt status, dkt. No. 32 at 11, this motion is **DENIED** because disputes of material fact exist related to this issue.

**SO ORDERED** this 24th day of July, 2023.


_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA